UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DIAMOND COMPUTER SYSTEMS, INC.

                Plaintiff,

                                             Case Number 03-10011-BC

v.                                          Honorable David M. Lawson

SBC COMMUNICATIONS, INC.,

                Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT AND SETTING STATUS CONFERENCE DATE

This matter is before the Court on a motion for summary judgment filed by defendant SBC Communications, Inc. (SBC). Plaintiff Diamond Computer Systems, Inc. (Diamond) alleged in a complaint filed in this Court that in negotiating and carrying out contracts with the defendant for the wholesale furnishing of Internet access services, the defendant violated the Telecommunications Act, Lanham Act, and federal and state antitrust legislation, and committed fraud in violation of state law. The plaintiff alleges that SBC made fraudulent representations about its ability to provide Internet connections to Diamond, and it induced Diamond to enter into provider contracts with false promises of exclusivity and agreements not to compete. The complaint also contains counts alleging promissory estoppel and tortious interference with business relations. The parties stipulated to dismissal of the antitrust, Telecommunications Act, and Lanham Act claims; SBC now alleges in its motion for summary judgment that the misrepresentations asserted by Diamond are not actionable because they are promises of future action, merger and "no-reliance" clauses in the agreements render the plaintiff's reliance on pre-contract representations unreasonable as a matter of law, the express contracts signed by the parties preclude Diamond from bringing claims for promissory

estoppel, and contractual limitations for damages should be enforced. Diamond opposed the motion and the Court heard oral argument on October 26, 2004. The Court ordered the parties to file supplemental briefs, which have been reviewed. The Court now finds that the plaintiff has offered sufficient facts to withstand summary judgment on its claims of promissory fraud and the merger and no-reliance clauses do not vitiate those claims; however, the promissory estoppel claim fails as a matter of law. The plaintiff concedes the lack of merit in its tortious interference claim, which will be dismissed. The Court, therefore, will grant in part and deny in part the defendant's motion for summary judgment.

I.

Diamond Computer Systems, Inc. is based in Saginaw, Michigan and provides Michigan customers with computer-related services including dial-up and high speed Internet access, web design, computer systems programming, and computer sales and repairs. Diamond was incorporated in February of 2000 and is wholly owned by president Carol Wajer, who runs the company along with her sons, Mark (vice president) and Jeff (operations manager). Mark provides advanced computer networking expertise for the company. Bill MacDonald, who owns and leases office space to Diamond, has invested in the company.

In February 2000, Diamond was looking to purchase wholesale Internet services in order to become a retail provider. On February 28, 2000, Mark Wajer called SBC, a large telephone and Internet services company, for information on how to become an Internet service provider. Around that time, SBC purportedly was "taking its first steps into the Internet" and was setting up its nationwide DSL service. Pl.'s Br. Opp'n to Def.'s Mot. Summ. J. Ex. 6, Misner Dep. at 12.

Internet service providers can provide customers with connections to the Internet at varying rates of speed. An advanced dial-up connection called an Integrated Services Digital Network (ISDN) transfers information over telephone lines at a rate faster than standard telephone dial-up connections. Digital Subscriber Lines (DSL) provide even faster transfer speeds over telephone lines. When DSL services are configured so that the customer's computer receives information faster than it transmits information, the connection is called an Asymmetric Digital Subscriber Line (ADSL). T-1 or DS-1 lines, which are faster than the dial-up connections, are dedicated Internet connections that do not rely on telephone lines. Internet service providers usually have a direct connection to the Internet called an Internet backbone to provide these services, which operates on a very fast T-3 or DS3 line. The Internet backbone is accessed at a location called a point of presence (POP). POP can also refer to the company that provides Internet services from that spot of access to the Internet backbone. Data switching equipment routes signals coming from individual computer users through Internet service providers to a POP and the Internet backbone. SBC supposedly was able to provide Internet service providers with all these connections.

Affiliates of defendant SBC contracted to provide Diamond the equipment and services necessary for the small company to become an Internet service provider in the Saginaw area. SBC's affiliates are collectively referred to as SBC or Ameritech, although SBC does not concede that it is legally responsible for any actions of affiliated companies or their employees. Karl Buslepp, an SBC sales executive, served as Diamond's primary contact with SBC. Kirk Bowen, an SBC employee, provided technical expertise for the services and equipment that Diamond requested. Maurice Badgett contracted with SBC to design Internet solutions and provided assistance with SBC's contractual arrangements with Diamond. A number of SBC managers supervised the

-3-

employees who worked directly with Diamond.  For instance, Wendy Klochko supervised Buslepp; Frank Klimko supervised Bowen; and Gary Misner supervised Badgett.  SBC's Michigan sales director Randy Peterson and regional sales director Evan Parke also became involved in working with Diamond.

Karl Buslepp of SBC first met with Carol and Mark Wajer on February 29, 2000.  Buslepp gave advice on the number of telephone lines that Diamond would require and provided quotes for services and equipment.  He told Diamond that SBC could quickly connect it to an Internet backbone through a nearby fiber optic cable.  He discussed SBC's plans to offer DSL in the United States, which was faster than the other Internet services then available to consumers in the Saginaw area.  SBC planned to invest nearly $6 billion into the project, called Project Pronto.  The Wajers state that they previously had not considered ADSL as a potential product for their business.

The parties met again on March 2, 2000 with Carol and Mark Wajer in attendance for Diamond, and Buslepp, Badgett, and Kirk Bowen in attendance for SBC.  After Buslepp evaluated Mark's computer networking expertise, the Wajers recall that Buslepp said, "I don't know if you know it or not but [our competitors are] way behind in getting their connections ready.  So that means we could come into this market and you could basically corner the market on high-speed connection because there is nobody else."  Pl's. Br. Opp'n to Def.'s Mot. Summ. J. Ex. 1, C. Wajer Dep. at 64; Ex. 2, M. Wajer Dep. at 64.  The two recall that Buslepp represented that Diamond had "been awarded the wholesale for your area," meaning that SBC would not compete against them on the retail level.  *Id.* Ex. 1, C. Wajer Dep. at 84, 98; Ex. 2, M. Wajer Dep. at 65-68.  Carol Wager testified that Buslepp stated, "We will not come into your area, and I will protect you to make sure that we don't come in your area . . . . I am high up.  I just got promoted.  I'm the head of this

-4-

[I]nternet thing." *Id*. Ex. 1, C. Wajer Dep. at 91.  Buslepp allegedly explained that Diamond would

become SBC's POP in the area.  Buslepp told the Wajers that SBC could connect Diamond to an

Internet backbone within six to eight weeks after an agreement was signed.  The Wajers state that

no one at SBC informed them that SBC lacked access to an Internet backbone from the Saginaw area

at that time.  *Id*. at 107; Ex. 2, M. Wajer Dep. at 75.

> As a follow-up to the meeting, Buslepp faxed a note to Mark, which stated:

> By now your mother told you that Ameritech would like to make Diamond its DSL
> POP to cover Saginaw, (the Tri-Cities?).  Morice [Badgett] informed me first thing
> this morning that he has talked to Ameritech Headquarters in Chicago about this and
> that it is very acceptable to them.

*Id*. Ex. 13.  Carol states that she attempted to verify the meaning of Buslepp's representations at the

March 2, 2000 meeting and in the fax message.  Buslepp told her that SBC could not sell retail

services in the Saginaw area because of federal Local Access and Transport Area (LATA) [*see e.g.,*

46 U.S.C. § 217] regulations.  *Id*. Ex. 1, C. Wajer Dep. at 260.  However, Buslepp explained that

SBC would not provide a wholesale guarantee in writing, specifically stating that "[i]n order to go

through the whole corporation to get paperwork, and everything, to do that we are just not going to

do that," but "[y]ou have my word as head of the [I]nternet division there that this is the way it's

going to be."  *Id*. at 95-96.

As a result of Buslepp's salesmanship, Diamond exceeded its initial phone line estimate by

committing to buy a minimum equipment order sufficient to support 1,000 ADSL lines.  *Id*. at 157;

Ex. 2, M. Wajer Dep. at 194.  Carol Wajer stated that Buslepp discussed joint advertising and

offered Diamond a list of customers who had asked SBC about DSL service.  *Id*. Ex. 1, C. Wajer

Dep. at 84-85.

As part of the preparation to sign agreements with SBC, Diamond created a business plan to obtain financing.  Carol Wajer recalled that Buslepp provided market information for the plan that predicted 70,000 customers annually.  According to Carol Wajer, Buslepp approved the business plan, which stated, "A promotional jump start will be provided by partnering with Ameritech [SBC] to be the exclusive provider of high speed [I]nternet service."  *Id*. Ex. 17, Diamond Bus. Plan at 3; Ex. 1, C. Wajer Dep. at 243; Ex. 2, M. Wajer Dep. at 193.  However, Carol states that Buslepp requested that Diamond remove the word "exclusive" at other places in the plan.  *Id*. Ex. 1, C. Wajer Dep. at 243.  Buslepp explained that the term should be removed because it would "make them a little more comfortable . . . They don't really like to let us use the word exclusive."  *Ibid*.

In spring of 2000, Diamond and SBC entered into a series of written agreements to enable Diamond to provide its customers with highspeed Internet services obtained through SBC.  On March 17, 2000, the parties agreed to a sixty-month contract for access to a DS3 Internet backbone connection to the Internet.  SBC promised an active connection six to eight weeks from the "Effective Date."  Although the "Effective Date" was never specified in the contract, the contract was signed on March 17, 2000 and SBC concedes that pursuant to the contract Diamond expected to have a connection sometime in the middle of May 2000.  On May 25, 2000, the contract was re-executed to correct a pricing error.

The defendant points out that the Internet Access Services Agreement included a liability-limiting provision, which states:

> IF AMERITECH SHOULD BE FOUND LIABLE FOR LOSS OR DAMAGE DUE TO A FAILURE ON THE PART OF AMERITECH REGARDLESS WHETHER CUSTOMER'S CLAIM IS BASED ON CONTRACT, TORT, STRICT LIABILITY, OR OTHERWISE, AMERITECH'S LIABILITY WILL BE LIMITED TO AN AMOUNT EQUAL TO THE CONTRACT PRICE OR THE DISPUTED SERVICES, OR THAT SUM OF MONEY ACTUALLY PAID BY THE

-6-

> CUSTOMER TOWARD THE DISPUTED SERVICES, WHICHEVER SUM WILL BE LESS, AS LIQUIDATED DAMAGES AND NOT AS A PENALTY, AND THIS LIABILITY WILL BE EXCLUSIVE.  IN NO EVENT WILL AMERITECH BE LIABLE FOR ANY LOSS OF CUSTOMER'S BUSINESS REVENUES, PROFITS, THE COST TO CUSTOMER OF THEIR ADVERTISEMENT OR ANY OTHER SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES OF ANY NATURE

Compl. Ex. C, Internet Access Agreement ¶ 17.  The contract also contained a merger provision, which states:

> ENTIRE AGREEMENT: No agent of Ameritech has any authority to make a representation or promise not contained in this Agreement.  This Agreement together with the attachments, constitutes the entire Agreement between Customer and Ameritech with respect to the matters contained herein and supersedes all prior oral or written representations and agreements.  All modifications to this Agreement must be confirmed in writing and signed by the party to be charged.

*Id*. ¶ 21.  The parties also executed contracts that would allow Diamond to provide its customers Internet services.  The parties signed agreements for DSL and an Asynchronous Transfer Mode (ATM) service on March 31, 2000.  The parties briefs do not state when performance was due under these contracts, but the DSL agreement states, "This Agreement is effective on the date set forth above and shall continue in effect for a period of forty (40) months."  *Id*. Ex. D, Data Serv. Agreement ¶ 1.5.  As with the DS3 agreement, no date is entered "above" in the "Effective Date" spot; however SBC states in its brief that Diamond knew that the proposed instillation date for DSL was sometime in June 2000.  Each agreement contained limitations of liability provisions, which state:

> In no event shall [the SBC contracting agent] be liable to Customer or any third party for any indirect, incidental, special or consequential damages, including without limitation, damages attributed to lost revenues or profits; lost business opportunities; loss of data or programming; or failure to realize savings or benefits, regardless of the cause of action, arising out of or in connection with [the SBC contracting agent's] performance under this Agreement.

-7-

*Id.* Ex. D, ADSL Agreement ¶ 9.1; Ex. E, Data Serv. Agreement ¶ 7.2.  These Agreements also provided merger clauses:

> The terms contained in this Agreement and the Schedules referred to herein, which are incorporated into the Agreement by this reference, constitute the entire agreement between the parties with respect to the subject matter hereof, superseding all prior understandings, proposals and other communications, oral or written.  Neither party shall be bound by any pre-printed terms additional to or different from those in this Agreement that may appear subsequently in the other party's form documents, purchase orders, quotations, acknowledgments, invoices or other communications. The Agreement may only be modified by a writing signed by both parties.

*Id.* Ex. D, ADSL Agreement ¶ 17; Ex. E, Data Serv. Agreement ¶ 20.9.

Installing the Internet backbone was not as quick or easy as Diamond was led to believe. SBC had to contract with another company, EUNET, to install an Internet backbone circuit in Saginaw because federal LATA regulations at the time prevented SBC from extending an Internet backbone connection from its POP in Detroit.  New fiber optic had to be "stretched, laid, or reused" to connect a backbone from another location, and EUNET required the services of yet another company, Sprint, to complete the job.  Pl.'s Br. Opp'n to Def.'s Mot. Summ. J. Ex. 6, Misner Dep. at 25.  At the same time that EUNET should have been installing the backbone connection intended for Diamond's use, SBC and EUNET were having nationwide difficulties installing Internet backbone services for other customers.  In addition, SBC had to install complex DSLAM equipment in order to activate DSL services.  The DSLAM was to be installed in the Saginaw area in June 2000, according to SBC's schedule.  Mark knew that DSL service required DSLAM installation.

SBC failed to connect Diamond to an Internet backbone by the middle of May 2000, which caused Diamond to miss its proposed Grand Opening date.  Diamond alleges that it hired personnel, committed capital, and prepared customers in anticipation of its opening date.  SBC failed to provide

a full and adequate explanation for the delay and allegedly did not warn Diamond in advance that a connection could not be achieved.

Representatives from Diamond and SBC met on June 20, 2000 to discuss the delays. SBC's representatives at the meeting included high-level managers Evan Parke, Randy Peterson, and Wendy Klochko, as well as Buslepp and Bowen. The Wajers, along with investor Bill McDonald, attended for Diamond. SBC assured Diamond of Internet access by the middle of August 2000. The Wajers sought, and believed they had received, assurances from SBC that Diamond would be the sole provider of ADSL retail services in the Saginaw area. Carol Wajer quoted the managers as stating that "[y]ou're in the wholesale unit or side of it." *Id.* at 137-38. SBC arranged a luncheon to notify their sales representatives to refer DSL clients to Diamond. However, Klochko stated that Peterson promised that Diamond would be "first to market" ADSL, but would still have to compete with SBC. *Id.* Ex. 8, Kolchko Dep. at 61-62. SBC agreed to provide slower T-1 service for some temporary Internet backbone capability until Diamond had its direct connection to an Internet backbone.

After the meeting, the parties executed an agreement of June 26, 2000 for ISDN Prime lines that could operate on a T-1 connection. The ISDN Agreement provided:

> **Limitation of Damages**- The liability of Ameritech for damages arising out of mistakes, omissions, interruptions, delays, errors or defects in transmission occurring in the course of furnished the [sic] Service . . . shall in no event exceed an amount equivalent to the proportionate charge to Customer for the period of Service during which such mistake, omission, interruption, delay, error or defect in transmission occurs. No other liability shall in any case attach to Ameritech.

Compl. Ex. F, ISDN Agreement ¶ 8. This contract also had a merger provision:

> This Agreement and the applicable tariff or catalog are the complete agreement between the parties and supersede any discussions, representation or proposals,

written or oral, concerning the Service. This Agreement may not be modified except by a writing signed by both parties.

*Id.* ¶ 15. SBC also furnished Diamond with a letter reassuring Diamond that highspeed service would be available on August 7, 2000.

SBC was not able to perform the installation of the Internet backbone by August 7, 2000 and then delayed reporting its difficulty until approximately August 18, 2000. Around that time, Bowen informed Diamond that SBC would require another twelve weeks to achieve installation by hand delivering an e-mail message written by Badgett. SBC installed the T-1 line in September 2000 to provide Diamond with some Internet capability. Carol Wajer states that the T-1 service was not sufficient to provide service to customers. On September 14, 2000 the parties executed an Addendum Agreement to reduce the cost to Diamond for the DSL lines, making the prices competitive with those charged in Detroit. Before the DS3 Internet backbone was finally installed, Carol Wajer states that there were many other start-up difficulties, such as the delivery of an inadequate phone system, and various hardware misconfigurations that resulted in data loss and loss of service. SBC began offering retail ADSL service on it own in the Saginaw area in January 2001. Diamond alleges that it finally could offer customers ADSL in February 2001, which SBC disputes.

On January 14, 2003, Diamond filed its complaint against SBC alleging antitrust violations, violation of the Telecommunications Act of 1996, violation of the Lanham Act, interference with business relations, and fraud, and asserting a claim based on promissory estoppel. SBC filed a counterclaim on May 29, 2003 for breach of the contracts entered into by the parties because Diamond failed to make payments as agreed under the contracts. As mentioned above, the parties stipulated to dismissal of the antitrust, Telecommunications Act, and Lanham Act claims on March

18, 2004, and the Court ordered the dismissal of those claims. SBC filed its motion for summary judgment as to the remaining claims.

Diamond alleges that by fraudulent conduct, SBC induced Diamond to enter into pricy contracts for Internet service that SBC had no intention of promptly providing, intending instead to dissuade Diamond from seeking out other wholesale carriers while simultaneously ensuring that SBC would be the first in the area to offer the Internet services to retail customers. As a consequence, Diamond says, it has suffered "staggering losses" and it "now teeters on the brink of financial ruin." Pl.'s Br. in Resp. to Mot. Summ. J. at 1. The defendant states that the plaintiff's problems result from unforeseen complications encountered in implementing new technology in the region.

## II.

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (internal quotes omitted).

A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the

substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Thus a factual dispute that "is merely colorable or is not significantly probative" will not defeat a motion for summary judgment that is properly supported. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993); *see also Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999).

The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

-12-

The party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991). It must be emphasized, however, that "[i]n evaluating the evidence, [the court] 'draw[s] all reasonable inferences therefrom in a light most favorable to the non-moving party.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## A.

The federal claims in this case have been dismissed and only state law claims remain. This Court has supplemental jurisdiction over those claims. *See* 28 U.S.C. § 1367(a) (stating that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution"); *see also Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 209 (6th Cir. 2004). "A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999). In such cases, the Court must apply the law of the forum state's highest court. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938). If the state's highest court has not decided an issue, then "the federal court must ascertain the state law from 'all relevant data.'" *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir.1995) (quoting *Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir.1985)). "Relevant data includes the state's intermediate appellate court decisions, as well as the state supreme court's

relevant *dicta*, restatements of the law, law review commentaries, and the majority rule among other states." *Ososki v. St. Paul Surplus Lines*, 156 F. Supp. 2d 669, 674 (E.D. Mich. 2001) (internal quotes and citation omitted) (citing *Angelotta v. Am. Broad. Corp.*, 820 F.2d 806, 807 (6th Cir. 1987)).

The plaintiff has cited authority from the Illinois state and federal courts in support of its position and suggests that Illinois law may govern because two of the written contracts contain a provision stating that the parties agree to be bound by Illinois law. The defendant disputes the point on the ground that the plaintiff's claim is for fraud, which sounds in tort, and therefore the contractual provisions are irrelevant. The defendant cites an unpublished court of appeals decision in support of its argument. *See Imaging Fin. Servs., Inc. v. Lettergraphics/Detroit, Inc.*, 178 F.3d 1294 (6th Cir. 1999) (unpublished).

When deciding matters of supplemental jurisdiction, a federal court must apply the substantive law of the forum state in which it sits, including the forum state's choice-of-law rules. *Menuskin v. Williams*, 145 F.3d 755, 761 (6th Cir. 1998). As the court of appeals explained in *Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607 (6th Cir. 2001), Michigan's choice-of-law rules do not render forum selection and choice-of-law clauses irrelevant in tort cases related to a contract. In *Watkins*, the court stated:

> Under Michigan law, a tort claim is governed by the law of the forum unless a "rational reason" exists to displace it. *Olmstead v. Anderson*, 428 Mich. 1, 29-30, 400 N.W.2d 292, 305 (1987). In *Imaging Fin. Servs. v. Lettergraphics/Detroit, Inc.*, 39 U.C.C. Rep. Serv.2d (CBC) 1116, 1999 U.S. App. LEXIS 2405, 1999 WL 115473 (6th Cir. 1999), an unpublished opinion, we held that under Michigan law, fraud is a tort claim, and that when an injury occurs in Michigan to a Michigan company, Michigan law would govern the claim despite a choice of law clause. *Id.* at *8-9. *Imaging Fin. Servs.* relied on *Allmand Assocs. v. Hercules, Inc.*, 960 F. Supp. 1216 (E.D. Mich. 1997). But in *Allmand*, the Court applied Michigan law not only because the effects of the tort were felt in Michigan, but also because the "parties agree[d]

-14-

that Michigan law applies." *Id*. at 1223 n. 3. In the instant case, the parties do not
so agree. Moreover, in *Allmand*, *id*. at 1222, and *Imaging Fin. Servs.*, *supra* at *11,
the allegedly fraudulent misrepresentations were misrepresentations of fact that
induced the plaintiff to enter a contract. In the instant case, on the other hand, the
fraud alleged is promissory fraud: Watkins alleges that Iams made promises of future
performance that it did not intend to keep. The distinction between such a claim and
a claim for breach of contract is so slight that the parties' agreement that Ohio law
would govern their agreement, i.e., their contract, is a sufficient reason to displace
the law of Michigan and apply Ohio law to Watkins's fraud claim. Therefore, we
conclude that the Court did not err by applying Ohio law to the claim.

*Id.* at 611. The teaching of this case is that when deciding a claim of promissory fraud arising from

entering a contract with a choice-of-law provision, the Court should apply standard Michigan

choice-of-law rules and incorporate the parties' choice of law into its analysis.

Although Michigan law now provides for a presumption that the law of the forum will

govern disputes sounding in tort, *see Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274,

562 N.W.2d 466 (1997), Michigan courts apply a two-step approach to determine if that

presumption can be overcome. "First, we must determine if any foreign state has an interest in

having its law applied." *Id.* at 286, 562 N.W.2d at 471. If another state does not have such an

interest, the inquiry ends and Michigan law applies. "If a foreign state does have an interest in

having its law applied, we must then determine if Michigan's interests mandate that Michigan law

be applied, despite the foreign interests." *Ibid.*

In this case, the only impetus directing the Court to consider application of Illinois law is a

choice-of-law provision in two of four contracts that the parties signed (not including the addendum

agreement). Of those four contracts, one agreement selects Michigan law, Compl. Ex. C, Internet

Access Services Agreement ¶ 19, two agreements select Illinois law, Compl. Ex. D, ADSL

Agreement ¶ 16.2; Ex. E, Data Serv. Agreement ¶ 20.2, and another does not contain a choice-of-

law provision, Compl. Ex. F, ISDN Agreement. The parties do not now agree as to the law that

should apply.  There have been no facts presented to suggest that the dispute has touched a foreign state at all:  nearly all of the allegedly fraudulent representations were made in Michigan; the statements were made to Michigan residents; the defendant does a substantial amount of its business in Michigan; and the statements all relate to a business agreement to be performed in Michigan.

For tort cases, Michigan's "balancing approach most frequently favors using the forum's (Michigan's) law." *Hall v. General Motors Corp.*, 229 Mich. App. 580, 585, 582 N.W.2d 866, 868 (1998).  The Court believes that a proper balance favors the application of Michigan law in this case as well.

B.

Under Michigan law, in order to succeed on a fraud claim, a plaintiff must show that (1) the defendant made a material misrepresentation that was false; (2) the defendant made the misrepresentation when he knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (3) the defendant made the misrepresentation with the intention that it be acted upon by the plaintiff; (4) plaintiff acted in reliance upon it; and (5) the plaintiff suffered injury.  *See Hord v. Envtl. Research Inst.*, 463 Mich. 399, 404, 617 N.W.2d 543, 546 (2000).  The defendant contends it is entitled to judgment in its favor as a matter of law because the undisputed facts undercut at least two of the essential elements of fraud: first, SBC states that the statements by Karl Busleep and its other representatives constitute no more than promises of future performance, and therefore they cannot form the basis of a misrepresentation of a present or past fact that is an essential element of fraud under Michigan law.  Second, SBC insists that it cannot be held accountable for Buslepp's misstatements because the merger and no-reliance clauses in the contracts

-16-

confine all representations to those contained in the written documents; therefore the plaintiff's reliance on Buslepp's prior statements is unreasonable as a matter of law.

1.

Michigan fraud jurisprudence requires that actionable misrepresentations must relate to an existing or past fact; promises relating to future actions when unfulfilled do not constitute fraud. *Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336; 347 N.W.2d 813 (1976). However, Michigan courts recognize exceptions to this general proposition. "[U]nder Michigan law, one can be held liable for broken promises when one has, at the time of the promise, a then-existing bad faith intent to break the promise." *Thompson v. Paasche*, 950 F.2d 306, 312 (6th Cir. 1991) (applying Michigan law). A Michigan court will apply this "false token" exception when "the facts of the case compel the inference that the promise was but a devise to perpetrate a fraud" and the promise was made "without intention of performance." *Hi-Way Motor Co.*, 398 Mich. at 339, 347 N.W.2d at 817; *see also Rutan v. Straehly*, 289 Mich. 341, 286 N.W. 639 (1939). Michigan courts also recognize fraudulent inducement to enter into a contract when "a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon and are relied upon." *Samuel D. Begola Servs., Inc. v. Wild Bros.*, 210 Mich. App. 636, 639, 534 N.W.2d 217, 219 (1995). A party induced by fraud to enter a contract may elect to void the contract. *Id.* at 640.

The plaintiff points to two major representations made by SBC that either were not true when made or that SBC had no intention of fulfilling: Diamond alleges that SBC told Wajer that Diamond was the wholesale POP for the Saginaw LATA and SBC would not compete against Diamond in the retail market; and SBC represented that it could connect Diamond to the fiber optic cable in front

-17-

of Diamond's office by the end of May 2000 to provide high speed Internet service.  There is evidence in the record, when viewed in the light most favorable to the plaintiff, that could prove that SBC did not intend to live up to those representations when they were made.  Carol Wajer testified that Buslepp represented at the March 2, 2000 meeting that, "You've been awarded the wholesale for your area," Pl.'s Br. Opp'n to Def.'s Mot. Summ. J. Ex. 1, C. Wajer Dep. at 84,"What this means for you, for Diamond, is that they [SBC] will never come into your region, ever," and "When they [SBC] make something a wholesale that's the way it stays." *Id*. at 98.  "We will not come into your area, and I will protect you to make sure that we don't come in your area . . . I am high up.  I just got promoted.  I'm the head of this [I]nternet thing." *Id*. at 91.  In response to Carol's subsequent inquiries about prospective competition from SBC, Buslepp stated that SBC could not compete for retail customers in the Saginaw area because of government LATA regulation.  Carol Wajer testified:

> A. . . . The subject was Karl Buslepp again.  Because the question came up again when I was hammering him about, you know, I wanted to be sure that they're not going to come directly into my area.
> And then he started talking about- You know, I says, "Well, why don't they just do it themselves?  Why do they want a company like Diamond, which is a new company, a small company, and here they are a large company that can well afford to run DSL up in this area?"  So I said, "I don't understand - -"  You know, I was telling Karl that.  And then this 1996 act come up and he was explaining how they could not do it themselves.  And  then he says-
> Q. Let me just stop you there.  "They could not do it."  What is "it"?
> A. Yeah, that Ameritech - - He was explaining to us that Ameritech could not - - that they needed a company to contract for these lines which the ADSL would have to go over.  That the - - I don't know.  I don't understand if it wasn't the fiber that wasn't here or what it was at that time.  Mark would again know more on that because he was talking more to him about that.
> But I know I did- - I was listening with him and asking questions because I just couldn't understand why I was a new company coming in and SBC/Ameritech at that time had enough means for them that they could just run these lines and do ADSL and market themselves.  Why would they want to have Diamond be their provider for ADSL was the question I was asking.

And this – Karl started talking about the 1996 Telecommunications Act that – He said it prohibits them from doing that.

*Id.* at 260-61.

Wajer also testified that this representation was discussed with Randy Peterson and Wendy Klochko well after the contracts were signed, and they did not dispute Buslepp's representations.

Wajer stated:

Q. Did you ever question Mr. Buslepp's authority to make promises to you?
A. I didn't until the June - - Getting towards that - - I would say May, probably around the May area of 2000.
Q. And who did you approach on this?
A. I called Randy Peterson.
Q. Now, isn't it true that at the June 20th meeting both Randy Peterson and Wendy Klochko told you that there was no promise of exclusivity in terms of Ameritech competing at the retail level?
A. Actually they were sitting here a little bewildered when we were talking about that and just said that they weren't aware that Ameritech had ever done that.
Q. Had ever done what? I'm sorry.
A. That they had ever made an offering of exclusivity. But they did not deny they did in my case. The just went, basically went along with what Karl had said. So that way I didn't - - You know, I mean, here I had some more people that were here that were higher up that Karl even and not disputing what Karl had told me.

*Id.* at 257-58.

The evidence that suggests the bad faith intention to break this promise when made comes from Frank Klimko, an SBC manager, who testified that even if Diamond was told it was a POP, SBC would never treat it as such because SBC would want to sell at the retail level. *Id.* Ex. 7, Frank Klimko Dep. at 60-61. Klimko stated:

Q. Okay. If Diamond Computer was told that it would be the wholesale point of presence for DSL services in the Saginaw lata, is that something that SBC would do?
A. No.
Q. Okay. So if they were told that, they were told something that SBC – SBC would not even entertain or perform, correct?
A. No.
Q. No what?

-19-

    A.  They wouldn't do that, because we have other - - other people buying that service.

*Id*. Ex. 7, Frank Klimko Dep. at 60-61.  In addition, Mark Yaeter, an SBC design engineer who

worked with Diamond, stated:

    A. My background and experience is that again a POP is a separate facility from our regulated network elements like a central office.
    Q. Okay.
    A. It is a stand-alone facility and it is typically unmanned and it is secure.
    . . .
    A. I would never imagine that Diamond would be considered a POP.

*Id*. Ex. 10, Mark Yaeter Dep. at 39-40.

    A reasonable fact finder could conclude on the basis of this evidence that SBC made a false

promise of exclusivity to Diamond in order to induce Diamond to enter into the Internet service

contracts without any intention of making Diamond a POP, and fully intending to enter into retail

competition with Diamond for the same services.

    With respect to the representation of quick and easy connectivity, Diamond alleges that SBC

falsely represented that it could connect Diamond to lines in front of Diamond's office that would

allow them to provide DSL services.  Carol Wajer testified that Buslepp represented, "'In fact,' he

says, 'Did you[] have any idea that fiber is right in your front yard here?'  He said, 'It's an excellent

location for an ISP.'"  *Id*. Ex 1, C. Wajer Dep. at 57.  Mark Wajer also testified that he "asked Karl

[Buslepp] about that and he just said that all they have to do is just hook the fiber up front for the

facilities and that's the only part of it that has to be completed. . . .  He said the fiber is already there,

the services is over at – we have to extend it to your denmark (sic) located in your facility."  *Id*. Ex.

2, M. Wajer Dep. at 84.  Based on these representations, Diamond understood that installing a

connection would be an easy task, and it had no reason to doubt that a DS3 line would be available

-20-

six to eight weeks after signing the Internet Access Agreement in March 17, 2000. However, the evidence also suggests that there was no fiber optic cable in front of Diamond's store that would enable DSL connectivity. Diamond argues that providing Internet backbone service in Saginaw was a difficult project that could not possibly have been completed by May 17, 2000, demonstrated by the fact that the service was not provided until February 2001. In addition, Gary Misner, an electrical and design engineer for SBC who directed sales for five states in 2000, explained that "when a POP is put into a city, for instance Detroit, there's a boundary drawn by the court, it's called a LATA, L-A-T-A, boundary that limits how far we can take service out from that city. For reasons I can't explain, the account team priced and put together the initial proposal to the customer coming from Detroit all the way to Saginaw across one of those boundaries. . . . The Saginaw POP was not capable of supporting a DS3 service at that time. . . . Legally I couldn't service it out of Detroit, because the FCC won't let me cross, at that time, cross that boundary." *Id*. Ex. 6, Misner Dep. at 22-23. Misner acknowledged that SBC had to contract with another company to put the fiber optic cables in place, and SBC had yet to bring equipment to the Saginaw area to activate service.

Based on this evidence, a fact finder could conclude that SBC did not intend to furnish Diamond the promised high speed Internet connections within the time represented by Buslepp when SBC did not even have its infrastructure in place to furnish the service. There is sufficient evidence to establish the plaintiff's "false token" theory.

2.

The defendant's argument that the merger clauses in the contracts undermine the plaintiff's reliance on Buslepp's representations presents a closer question. As noted above, to prove fraud the

plaintiff must show that it acted in reliance on the defendant's false representation. However, "[a]

misrepresentation claim requires *reasonable* reliance on a false representation." *Nieves v. Bell*

*Indus., Inc.*, 204 Mich. App. 459, 464, 517 N.W.2d 235, 238 (1994) (emphasis added). The merger

clauses in the contracts provide:

> ENTIRE AGREEMENT: No agent of Ameritech has any authority to make a representation or promise not contained in this Agreement. This Agreement together with the attachments, constitutes the entire Agreement between Customer and Ameritech with respect to the matters contained herein and supersedes all prior oral or written representations and agreements. All modifications to this Agreement must be confirmed in writing and signed by the party to be charged.

Compl. Ex. C, Internet Access Agreement ¶ 21.

> The terms contained in this Agreement and the Schedules referred to herein, which are incorporated into the Agreement by this reference, constitute the entire agreement between the parties with respect to the subject matter hereof, superseding all prior understandings, proposals and other communications, oral or written. Neither party shall be bound by any pre-printed terms additional to or different from those in this Agreement that may appear subsequently in the other party's form documents, purchase orders, quotations, acknowledgments, invoices or other communications. The Agreement may only be modified by a writing signed by both parties.

*Id*. Ex. D, ADSL Agreement ¶ 17; Ex. E, Date Serv. Agreement ¶ 20.9.

> This Agreement and the applicable tariff or catalog are the complete agreement between the parties and supersede any discussions, representation or proposals, written or oral, concerning the Service. This Agreement may not be modified except by a writing signed by both parties.

*Id*. Ex. F, ISDN Agreement ¶ 15.

> This Addendum and the GSA set forth the entire understanding of the parties and supersede any and all prior agreements, arrangements, representations or understandings relating to the subject matter hereof. No subsequent agreement between Customer and SBC-ASI concerning the subject matter hereof shall be effective or binding unless it is made in writing.

-22-

*Id.* Ex. G, Addendum Agreement ¶ 15.  SBC contends that Diamond cannot rely on representations that are contrary to written provisions of an instrument to be signed.  *In re Dosker*, 284 Mich. 597, 602; 280 N.W. 61,63 (1938).

Other courts in this Circuit have addressed the argument that merger and integration clauses in a contract preclude reliance on representations made prior to contract execution.  *See Papa John's Int'l, Inc. v. Dynamic Pizza, Inc.*, 317 F. Supp. 2d 740, 745 (W.D. Ky. 2004) (holding that the merger clause barred reliance on representations made before the contract was signed).  The court of appeals reached such a result in *Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607, 612 (6th Cir. 2001) (applying Ohio law stating that "[i]f a written contract is completely integrated, it is unreasonable as a matter of law to rely on parol representations or promises within the scope of the contract made prior to its execution").  The issue was discussed at length in *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557 (6th Cir. 2003).  In that case, the plaintiff signed a lease on a gas station and convenience store and entered into a supply agreement with the defendant, both of which contained language allowing either party to withdraw from the agreement on thirty days' notice.  Before signing the agreement, the plaintiff sought and obtained assurances that the agreements would be continued and renewed from year to year as long as the plaintiff performed as promised.  However, after the plaintiff signed the contracts, invested money in improvements, and began operations, the defendant sold the facility and terminated the contracts under the thirty-day clauses.  The plaintiff sued for fraud, and the district court granted summary judgment on the ground that the merger clauses in the agreements precluded reasonable reliance.  The court of appeals reversed and held that the plaintiff could proceed with his promissory fraud claim despite the merger clauses in the lease and contract.  The court explained:

-23-

> Despite Defendant's assertion otherwise, there is no rule that a merger clause makes reliance on oral representations unreasonable *per se* so as to necessarily defeat a fraudulent inducement or promissory fraud claim. *Watkins* is distinguishable in two respects. First, the *Watkins* Court made clear that it was reaching a fact-based conclusion, not announcing a new *per se* rule. . . . Second . . . nothing suggests the Tennessee judiciary has either adopted or would adopt a *per se* rule that an integration clause makes it always unreasonable to rely on prior oral representations.

*Id.* at 568.

Michigan courts likewise have not adopted a *per se* rule making reliance on prior statements unreasonable after a contract containing a merger clause is signed. Although the state supreme court has observed that "an integration clause nullifies all antecedent agreements," *Archambo v. Lawyers Title Ins. Corp.*, 466 Mich. 402, 413, 646 N.W.2d 170, 177 (2002) (citation omitted), the court made clear that this rule is "[s]ubject . . . to evidence of certain kinds of fraud (or other grounds sufficient to set aside a contract) and for the rare situation when the written document is obviously incomplete on its face." *Id.* at 414 n.15, 646 N.W.2d at 177 n.15 (internal quotes and citations omitted).

Michigan's intermediate appellate court has explained that fraud relating to discrete contract terms will not serve as the basis to undo a merger clause. *UAW-GM Human Resource Center v. KSL Recreation Corp.*, 228 Mich. App. 486, 502, 579 N.W.2d 411, 418 (1998). Rather, "the only fraud that could vitiate the contract is fraud that would invalidate the merger clause itself, i.e., fraud relating to the merger clause or fraud that invalidates the entire contract including the merger clause." *Id.* 228 Mich. App. at 503, 579 N.W.2d at 419 (quoting 3 Corbin, Contracts, § 578).

In this case, the plaintiff contends that the defendant's misrepresentations induced it to enter into all of the contracts to provide Internet services on a wholesale basis so that it could embark on its business venture of providing those services to retail consumers in the Saginaw region. To the extent that the plaintiff maintains that it would not have entered into these agreements but for the

-24-

misrepresentations concerning exclusivity and quick and easy connectivity, the plaintiff alleges fraud that would invalidate the entire contracts, including the merger clauses. Like the plaintiff in *Shah*, Diamond has raised a genuine issue of material fact as to its promissory fraud claim. The merger clauses do not render the plaintiff's reliance on prior representations unreasonable as a matter of law. The Court, therefore, will deny the motion for summary judgment as to the fraud count of the complaint.

C.

The defendant also challenges the plaintiff's promissory estoppel claim. A promissory estoppel claim consists of three elements: (1) a promise; (2) that the promisor reasonably should have expected to induce action by the promissee; (3) and which produces detrimental reliance or forbearance by the promisee. *APJ Assocs., Inc. v. North Am. Philips Corp.*, 317 F.3d 610, 617 (6th Cir. 2003). Michigan courts only apply promissory estoppel when "an implied agreement exists between the parties, in the absence of an express contract." *Ibid.* "If the performance satisfying the detrimental reliance requirement is the same performance which constitutes the consideration of a written commercial contract, the doctrine of promissory estoppel is not applicable." *Willis v. New World Van Lines, Inc.*, 123 F. Supp. 2d 380, 395 (E.D. Mich. 2000).

SBC argues that the contractual agreements preclude Diamond's promissory estoppel claims. Diamond argues that the contractual agreements do not bar its claim because SBC's promises are independent of the contracts and SBC did not bargain for Diamond's detrimental reliance, citing *Willis v. New World Van Lines, Inc.*, 123 F. Supp. 2d 380 (E.D. Mich. 2000).

The statements relied upon by Diamond to support its promissory estoppel claim are the same statements Diamond contends are fraudulent. According to Diamond, those statements led,

-25-

rightly or wrongly, to the execution of the written contracts that Diamond says it would not have entered had it known the truth.  In other words, the action induced by SBC's promises was the execution of the written contracts and Diamond's own promises thereunder.  Although Diamond may claim that entering into agreements with SBC foreclosed its ability to sign up with other wholesale Internet service providers, the Sixth Circuit has held that a party is not entitled to claim promissory estoppel under those circumstances. *See Gen. Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1042 (6th Cir. 1990) (noting that "where the performance which is said to satisfy the detrimental reliance requirement of the promissory estoppel theory is the same performance which represents consideration for the written contract, the doctrine of promissory estoppel is not applicable") (internal quotes, alterations, and citation omitted).

Moreover, if the plaintiff prevails on its fraud claim, the contracts will be voidable by it. Under Michigan law, "rescission abrogates a contract completely."  All former contract rights are annulled; it is as if no contract had been made." *Samuel D. Begola Servs., Inc. v. Wild Bros.*, 210 Mich. App. 636, 640, 534 N.W.2d 217, 220 (1995) (voiding a contract for fraudulent inducement). Therefore, the plaintiff may seek either damages for fraud or recision of the contract for fraudulent inducement, but the promissory estoppel claim is subsumed within the plaintiff's fraud allegations.

D.

Finally, the defendant argues that the Court should enforce the clear and unambiguous limitation of liability provisions.  However, the fraud claim is not founded on the contracts, so the contracts cannot limit SBC's liability. As noted earlier, the plaintiff's fraud theory is that the defendant's misrepresentations induced the plaintiff to enter into the *entire* contracts, not just a single provision or term, such as the limitations of damages term.  If the plaintiff prevails, the entire

-26-

contracts will be voidable, including the limitations of damages provision.  Moreover, fraud as alleged by the plaintiff in this case is an intentional tort.  Under Michigan law, "[i]t is well established in this jurisdiction that . . .  a party may not insulate himself against liability for gross negligence or wilful and wanton misconduct."  *Lamp v. Reynolds*, 249 Mich. App. 591, 594, 645 N.W.2d 311, 314 (2002) (addressing a contractual waiver provision).  The limitation of damages provision has no application to the fraud claim in this case.

III.

The Court concludes that the plaintiff has established material fact questions on all the elements of its fraud claim, but the claim for promissory estoppel cannot proceed as a matter of law. The plaintiff concedes the lack of merit in its tortious interference claim.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt #66] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that Counts V (interference with business relations) and VII (promissory estoppel) of the complaint are **DISMISSED WITH PREJUDICE**.  The plaintiff may proceed to trial on Count VI of the complaint alleging fraud.

It is further **ORDERED** that the defendant's motion to apply the limitation of damages clause in the contracts is **DENIED**.

It is further **ORDERED** that the parties appear for a status conference on Tuesday, **April 18, 2006 at 2:00 p.m.** to discuss further case management.

s/David M. Lawson          <br>
DAVID M. LAWSON<br>
United States District Judge

Dated: March 27, 2006

-27-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 27, 2006.

s/Tracy A. Jacobs
TRACY A. JACOBS